**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **REGINA WREN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 7:18-cv-00060-O-BP** |
| | § | |
| **MIDWESTERN STATE** | § | |
| **UNIVERISTY,** *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Before the Court are Defendants Midwestern State University, Keith Williamson, Debra Walker, Julia Knauff, and Kristina Halberg's Motion to Dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) (ECF No. 16), Brief in Support (ECF No. 17), and Appendix in Support (ECF No. 18) filed July 30, 2018 and Plaintiff Regina Wren's Brief in Opposition of Defendants' Motion to Dismiss filed August 21, 2018. Pursuant to Special Order No. 3, the case was referred on April 30, 2018 to the undersigned for pretrial management, including the determination of non-dispositive motions and issuance of findings of fact and recommendations on dispositive motions. (ECF No. 5). After considering the pleadings and applicable law, the undersigned **RECOMMENDS** that United States District Judge Reed O'Connor **GRANT** Defendants' Motion to Dismiss (ECF No. 16), **DISMISS** Plaintiff's claims **without prejudice**, and allow Plaintiff an opportunity to file an amended complaint within the fourteen days allotted for objections to this recommendation. If, however, Plaintiff files an amended complaint within the prescribed time period, the Motion should be **DENIED** as moot, and the action should be allowed to proceed on the amended complaint.

## BACKGROUND

Plaintiff Regina Wren ("Wren"), a nursing student who had been enrolled in MSU's Family Nurse Practitioner program ("FNP"), sued Defendant Midwestern State University ("MSU") and Keith Williamson ("Williamson"), Medical Director; Debra Walker ("Walker"), Graduate Coordinator; Julia Knauff ("Knauff"), Associate Professor; and Kristina Halberg ("Halberg"), Instructor (the "individual MSU Defendants" and collectively the "Defendants") for alleged discrimination and retaliation against Wren based on her disability status and race. Wren's First Amended Complaint ("FAC") focuses on MSU's immunization and double grading policies that Wren contends were used against here and caused her to fail a required clinical practicum that eventually led to her withdrawal from the FNP.

In the Fall of 2011, Wren enrolled in the three-year FNP offered by MSU at the Wilson School of Nursing. (ECF No. 7 at 3). Before being admitted to the FNP, Wren was required to submit a compliance packet that showed proof of immunization or a qualified exemption from immunization. Wren alleges that she has severe allergies that preclude her from obtaining certain vaccinations. (*Id.* at 18). Apparently, Wren's application was acceptable to MSU because Wren was admitted into the FNP and progressed without incident until the Spring 2013 semester. (*Id.* at 3).

Some of the FNP courses require a clinical practicum in addition to classroom instruction. In the Spring of 2013, Wren took a Health Assessment course that required a clinical practicum. Wren did not receive a passing grade in the clinical practicum, and as a result, she did not earn a passing grade for the Health Assessment course after her classroom and clinical practicum scores were averaged. (*Id.*). Because it was a required course, Wren was unable to progress in the FNP until she earned a passing grade. MSU did not offer the Health Assessment course until the Spring

of 2014 so Wren did not enroll in any classes during the 2013 summer and fall semesters. (*Id.*).

Wren reenrolled in the Health Assessment course and passed in the spring of 2014. (*Id.* at 4). She took and passed classes during the summer and submitted another compliance packet to be enrolled in the FNP I course.

As part of the FNP I course, Wren was required to log 192 hours at the Vincent Health Center ("VHC"), a campus student clinic. (*Id.*). VHC also required FNP students to show proof of immunization before being allowed to log clinical hours. VHC had concerns about Wren's immunization exemption. After reviewing the documents Wren submitted from her primary care physician, VHC denied her access to the clinic because the paperwork submitted did not comply with the state of Texas' statutory requirements. (*Id.* at 5). VHC allegedly asked Wren for medical records substantiating her severe allergic reaction to vaccinations. (*Id.* at 17). Wren neither submitted the appropriate medical records nor obtained the required vaccinations. (*Id.* at 5). She dropped the FNP I course in October 2014. (*Id.*). However, in November 2014, she submitted the proper affidavit that stated that she declined to be immunized for reasons of conscience. (*Id.*). Shortly thereafter, MSU accepted the affidavit, and Wren reenrolled in FNP I for the Fall 2015 semester. (*Id.* at 6).

After completing FNP I, Wren enrolled in the Spring 2016 FNP II course. Like FNP I, FNP II required students to log clinical hours and to complete a clinical practicum examination. Wren, who is African-American, and another African-American student, were switched to Halberg's clinical group for the FNP II course. (*Id.* at 7). Halberg's clinical group consisted of only three students, all of whom were female. The third student in Wren's group was Caucasian. (*Id.*).

Wren alleges that Halberg was immediately hostile to her and the other African-American student. (*Id.*). Despite Wren's allegations that she had received a grade of 100 from Walker on her

first major written didactic assignment, received a grade of 90 from Halberg on her first major written clinical assignment, and had an A average in both the classroom and clinical portions of FNP II, she, along with other students, filed a complaint with the Office for Civil Rights complaining about harsh grading practices when compared to Caucasian students. (*Id.* at 7–9). She alleges that the complaints were not finalized due to fear of retribution. (*Id.* at 7).

The day before Wren was to take the FNP II clinical practicum midterm examination, Halberg sent her an email indicating that her written clinical assignment was graded lower because she did not submit it on time. (*Id.* at 9). The email also informed Wren that she had failed to follow instructions to confirm the time of her clinical practicum examination at least twenty-four hours in advance. (*Id.*). Wren also received a communication from the Wilson School of Nursing requesting compliance documents for vaccinations and a drug screen. (*Id.* at 8).

On the day of the clinical practicum examination, Wren and the other African-American student arrived at Halberg's clinic well before noon, but were forced to wait for over an hour in the lobby while the Caucasian student in their group was already seeing patients. (*Id.* at 9). Presumably, Halberg was waiting for Knauff so that Wren and the other African-American student could be "double graded." (*Id.*). Wren alleges that they were the only FNP II students to be double graded. (*Id.* at 10). Wren alleges that Halberg and Knauff were hostile and harshly critical of her and limited her to a single textual reference during the exam, which only lasted one hour. (*Id.* at 10–11). She claims that no other student was limited to a single reference. (*Id.* at 11). As a result, Wren and the other African-American student obtained a failing grade on the clinical practicum exam. (*Id.*). Wren's scores were 49 from Knauff and 53 from Halberg. (*Id.*).

Both students were instructed to retake the clinical practicum examination administered by a different instructor who allowed them to use more than one resource during the exam. (*Id.* at 12).

4

Wren received an 83 on the second examination, but when her scores were averaged, she still failed

to obtain a passing grade of 80. (*Id.*). Thus, even though the exam was only a midterm, she was

not able to complete the course. Wren claims that she was coerced into withdrawing from FNP II.

(*Id.* at 13).

Wren presents ten counts in her FAC (ECF. No. 7): (1) against all Defendants, violations

of Title II of the Americans with Disabilities Act ("ADA"), violations of Section 504 of the

Rehabilitation Act ("RA"), substantive due process and equal protection violations under the

Fourteenth Amendment to the U.S. Constitution, free speech violations under the First

Amendment, and state law claims for breach of fiduciary duty and violations of Title 25 of the

Texas Administrative Code Section 97.62 ("Section 97.62"); (2) against MSU, Walker, Knauff,

and Halberg, violations of Title VI of the Civil Rights Act of 1964 and 42 U.S.C. §§ 1981, 1983,

and 1985; and state law claims for breach of implied contract, libel, and defamation; (3) against

MSU, Knauff, and Halberg, the state law claim of intentional infliction of emotional distress; and

(4) against MSU, the state law claim of fraud. Wren seeks compensatory damages, exemplary

damages, and attorneys' fees (although Wren is proceeding *pro se*) for Defendants' conduct that

led to Wren's dismissal from the FNP.

After Wren filed her FAC, adding Defendant Williamson, Defendants filed the pending

Motion to Dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) and for failure to

state a claim upon which relief may be granted under Rule 12(b)(6). Wren responded to the Motion,

but Defendants did not file a reply. The Motion is now ripe for disposition.

**LEGAL STANDARD**

**I.      Federal Rule of Civil Procedure 12(b)(1)**

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to move for dismissal

of a complaint based on lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Because "[f]ederal courts are courts of limited jurisdiction[, t]hey possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). If a Court lacks subject matter jurisdiction, it must dismiss the action. Fed. R. Civ. P. 12(h)(3). In determining whether subject matter jurisdiction exists, a court "must presume that a suit lies outside this limited jurisdiction, and the burden of establishing federal jurisdiction rests on the party seeking the federal forum." *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *CleanCOALition v. TXU Power*, 536 F.3d 469, 473 (5th Cir. 2008) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)).

"When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977)). When considering a Rule 12(b)(1) motion, the court may consider evidence beyond the pleadings. *Moran v. Kingdom of Saudi Arabia,* 27 F.3d 169, 172 (5th Cir. 1994). "The district court may dismiss for lack of subject matter jurisdiction based on (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Lowe v. ViewPoint Bank*, 972 F. Supp. 2d 947, 953 (N.D. Tex. 2013) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

A dismissal under Rule 12(b)(1) is without prejudice because it "is not a determination of the merits and does not prevent the plaintiff from pursuing a claim in a court that does have proper

jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

## II.    Federal Rule of Civil Procedure 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted. The Rules require that each claim contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a). A complaint must include sufficient factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In considering a Rule 12(b)(6) motion, courts "take all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff . . . and ask whether the pleadings contain 'enough facts to state a claim to relief that is plausible on its face.'" *Yumilicious Franchise, L.L.C. v. Barrie*, 819 F.3d 170, 174 (5th Cir. 2016) (citing *Twombly*, 550 U.S. at 547). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

There exists a "well-established policy that the plaintiff be given every opportunity to state a claim." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977)). It is federal policy to decide cases on the merits rather than technicalities, and thus when possible the Fifth Circuit has recommended that suits be dismissed without prejudice on Rule 12 motions. *Great Plains Tr. Co.*, 313 F.3d at 329; *Hines v. Wainwright*, 539 F.2d 433, 434 (5th Cir. 1976) (vacating and remanding a Rule 12(c) dismissal with instructions to the district court to dismiss without, instead of with, prejudice). As a result, courts generally allow plaintiffs at least one opportunity to amend following a Rule 12 dismissal

on the pleadings. *See, e.g.*, *Great Plains Tr. Co.*, 313 F.3d at 329; *see In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 548–49 (N.D. Tex. 2014) (Boyle, J.) (dismissing for failure to state a claim without prejudice, as dismissing with prejudice would be "too harsh a sanction").

A *pro se* plaintiff's pleadings are liberally construed. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A "*pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Id.* However, if the court determines that a plaintiff has pleaded his or her best case, a district court does not err in dismissing a *pro se* complaint with prejudice. *Jones v. Greninger*, 188 F.3d 322, 326–27 (5th Cir. 1999) (citing *Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986); *Bazrowx v. Scott*, 136 F.3d 1053, 1054 (5th Cir. 1998)).

## ANALYSIS

**I.    The Eleventh Amendment bars claims against MSU and the individual MSU Defendants, to the extent the individual MSU Defendants are sued in their official capacities.**

Under the Eleventh Amendment, states may not be sued in federal court unless they unequivocally consent to the suit or unless Congress, pursuant to a valid exercise of power, unequivocally expresses its intent to abrogate immunity. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99–100 (1984). Eleventh Amendment immunity extends to state agencies and to state officials if the relief sought would operate against the state. *Id.* at 101.

Defendants claim that MSU is an agency of the state of Texas and is, therefore, entitled to Eleventh Amendment immunity barring Wren's claims. Defendants' contention is well founded as MSU is a "[g]eneral academic teaching institution" and is under the organization, control, and management of MSU's board of regents. Tex. Educ. Code. Ann. § 61.003(3) (West Supp. 2018); *Id.* § 103.02 (West 2002). Further, Wren's FAC states that "MSU is a Texas educational institution

formed under the laws of the [s]tate of Texas[.]" (ECF No. 7 at 2). Therefore, MSU is an agency of the state of Texas and is entitled to Eleventh Amendment immunity. *Lewis v. Midwestern State Univ.*, 837 F.2d 197, 198 (5th Cir. 1988).

Moreover, Wren alleges that the individual MSU Defendants were "acting as constituent entities, agents and/or employees in the course and scope of their agency or employment with MSU." (ECF No. 7 at 2). Thus, Wren has sued the individual MSU Defendants in their official capacities. *Streety v. Univ. of Texas at Arlington*, No. 4:09-CV-012-Y, 2009 WL 10705151, at *1 (N.D. Tex. July 29, 2009) (concluding the allegations make clear that plaintiff sued individual defendants in their official capacities) (citing *Choctaw County Bd. of Ed. v. United States*, 417 F.2d 845, 846 (5th Cir. 1969)). And the individual MSU Defendants are entitled to Eleventh Amendment immunity because "the state is the real, substantial party in interest." *Pennhurst*, 465 U.S. at 101; *Union Pac. R. Co. v. Louisiana Pub. Serv. Comm'n*, 662 F.3d 336, 340 n.3 (5th Cir. 2011) (per curiam) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.") (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).

But there are three possible exceptions to Eleventh Amendment immunity: (1) for claims seeking injunctive or declaratory relief against a state official under *Ex Parte Young*, 209 U.S. 123 (1908); (2) a state's waiver or consent, *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 267 (1997); and (3) Congress's abrogation of the state's immunity through section 5 of the Fourteenth Amendment, *Bd. of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356, 364 (2001).

### A.    Exceptions to Eleventh Amendment Immunity

#### i.    Application of *Ex Parte Young*

*Young* allows only the granting of "prospective injunctive relief to prevent a continuing violation of federal law" against state officers in their official capacities and does not allow damages or other retrospective relief. *Green v. Mansour*, 474 U.S. 64, 68 (1985). Although Wren has sued individuals in their official capacities, she has not pleaded for injunctive relief and has only pleaded for monetary damages. Thus, the exception to Eleventh Amendment immunity under *Ex Parte Young* is unavailable to her on all claims. *See, e.g.*, *Wetherbe v. Texas Tech Univ. Sys.*, 699 F. App'x 297, 302 (5th Cir. 2017) (per curiam) (dismissing claims against a dean of the university in his official capacity because plaintiff did not seek prospective injunctive relief).

#### ii.    Texas state law claims

Wren neither pleaded nor directed the Court to authority showing that the state of Texas has waived immunity or consented to suit for Texas state law claims. Indeed, Congress has not abrogated Texas' Eleventh Amendment immunity for breach of contract or tort claims, and Texas has not consented to suit in federal court. *See Duncan v. Univ. of Texas Health Science Ctr. at Hous.*, 469 F. App'x. 364, 366 & n.3 (5th Cir. 2012) (per curiam) (Texas contract and tort claims against a state university were barred by sovereign immunity); *Kitchens v. Tex. Dep't of Human Res.*, 747 F.2d 985, 986 (5th Cir. 1984) (contract claims); *Sherwinski v. Peterson*, 98 F.3d 849, 852 (5th Cir. 1996) (tort claims); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 101.057 (West 2011) (explicitly not providing for a waiver under the Texas Torts Claims Act for intentional torts).

Accordingly, Wren's breach of implied contract, breach of fiduciary duty, intentional infliction of emotional distress, libel, defamation, and fraud claims are barred by Eleventh

Amendment immunity and should be dismissed without prejudice to her right to refile them in state court.

Wren also alleges a claim under section 97.62 of Title 25 of the Texas Administrative Code. Section 97.62 provides exclusions for individuals from Texas' immunization requirements in public or private primary or secondary schools or institutions of higher education. The statute does not, however, provide a private right of action for a failure to grant an immunization exception to a student. Nor does Wren allege that Texas has waived or consented to potential liability under section 97.62. It is well settled Texas law that for a statute to waive liability, the waiver must be in clear and unambiguous language. *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 696 (Tex. 2003) (citing Tex. Gov't Code § 311.034). Wren has not directed the Court to such a waiver, nor is the Court aware of any. Accordingly, without deciding whether there can be a private action for violation of section 97.62, any potential claims are barred by Eleventh Amendment immunity.

### iii. Constitutional and 42 U.S.C. §§ 1981, 1983 and 1985 Claims

Wren neither pleaded nor directed the Court to authority showing that the state of Texas has waived immunity or consented to suit for claims alleged under 42 U.S.C. §§ 1981, 1983, and 1985. The law is clear that Texas has not waived immunity or consented to suit under these sections. *See, e.g.*, *Quern v. Jordan*, 440 U.S. 332, 338 n.7 (1979) ("§ 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States[.]"); *Baldwin v. Univ. of Texas Med. Branch at Galveston*, 945 F. Supp. 1022, 1030 (S.D. Tex. 1996) ("Congress did not abrogate the states' Eleventh Amendment immunity by enacting 42 U.S.C. §§ 1981, 1983, and 1985."); *Sessions v. Rusk State Hospital*, 648 F.2d 1066, 1069 (5th Cir. 1981) ("Section 1981 contains no congressional waiver of the state's Eleventh Amendment immunity."). Accordingly, Wren's §§ 1981, 1983 and 1985 claims against MSU and against Walker, Knauff,

and Halberg in their official capacities are barred by Eleventh Amendment immunity and should be dismissed.

So too are Wren's constitutional claims barred by Eleventh Amendment immunity. For state officials sued in their official capacities, like the individual MSU Defendants, the proper vehicle to assert constitutional claims is through § 1983. *See Hearth, Inc. v. Dep't of Pub. Welfare*, 617 F.2d 381, 383 (5th Cir. 1980); *Shah v. Univ. of Texas Sw. Med. Sch.*, 129 F. Supp. 3d 480, 494 n.9 (N.D. Tex. 2015) (noting that § 1983 provides the means for seeking relief against a state actor who violates the Constitution). And as already discussed, Wren has not pleaded for prospective injunctive relief so the exception under *Young* is not available. And for MSU, even if Texas had waived MSU's Eleventh Amendment immunity, MSU is not a "person" under § 1983 and is, therefore, not a proper defendant. *Stotter v. Univ. of Texas at San Antonio*, 508 F.3d 812, 821 (5th Cir. 2007). Accordingly, Wren's First Amendment retaliation, due process, and equal protection claims are barred by Eleventh Amendment immunity.

## II.    Title VI of the Civil Rights Act of 1964

Wren has sued MSU and individual MSU Defendants Walker, Halberg, and Knauff in their official capacities for violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI"). (ECF No. 7 at 19–20). This claim is made in the same section as Wren's 42 U.S.C. §§ 1981, 1983, and 1985 claims. There is no independent discussion of each claim.

As for the application of Eleventh Amendment immunity, Wren has failed to plead facts showing that Texas waived immunity or consented to suit under Title VI or that Congress abrogated Texas' immunity under section 5 of the Fourteenth Amendment. Nevertheless, Congress has abrogated the states' Eleventh Amendment immunity for a violation of Title VI. 42 U.S.C. § 2000d-7.

Title VI provides, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. To sustain a Title VI claim, Wren must allege "(1) that [MSU] engaged in *intentional* discrimination based on race, color, or national origin; and (2) that [MSU] received federal financial assistance." *Pathria v. Univ. of Texas Health Sci. Ctr. at San Antonio*, 531 F. App'x 454, 455 (5th Cir. 2013) (per curiam) (emphasis in original). Wren's FAC does not contain any allegations that MSU received federal financial assistance. But even assuming that MSU had received federal financial assistance, her Title VI claims still should be dismissed. *See Easley v. Univ. of Texas at Arlington*, 984 F. Supp. 2d 631, 636 (N.D. Tex. 2013) (proceeding on the merits of a Rule 12(b)(6) motion even though plaintiff had failed to plead defendant received federal funds).

Wren's Title VI claim must set forth "specific allegations of acts that were taken with discriminatory intent[.]" *Mohamed for A.M. v. Irving Indep. Sch. Dist.*, 252 F. Supp. 3d 602, 627 (N.D. Tex. 2017) (citation omitted). To survive a motion to dismiss, Wren's allegations must create a reasonable inference that MSU's discriminatory conduct was motived by race, color, or national origin. *See Pathria*, 531 F. App'x at 455 (citing *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)). Entities, such as MSU, cannot be held vicariously liable under Title VI. *Mohamed*, 252 F. Supp. 3d at 628 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285–288 (1998)). Moreover, when a Title VI claim does not involve an official policy of intentional discrimination, a plaintiff must allege an "appropriate person—an official authorized to institute corrective measures—had actual knowledge of the discrimination and responded with deliberate indifference." *Mohamed*, 252 F. Supp. 3d at 627 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998))

(internal quotations omitted).

Without deciding whether the acts of Walker, Halberg, and Knauff create a reasonable inference of unlawful discrimination against Wren, those claims must be dismissed because MSU cannot be held vicariously liable under Title VI. Further, Wren has not alleged an official discriminatory policy or that an "appropriate person" had actual knowledge of any discriminatory acts committed by Walker, Halberg, and Knauff and responded with deliberate indifference. Thus, Wren's Title VI claim should be dismissed.

## III.    Section 504 of the Rehabilitation Act Claims

Section 504 of the RA prohibits "any program or activity receiving Federal financial assistance" from discriminating against a "qualified individual with a disability." 29 U.S.C. § 794(a). As with her Title VI claim, Wren has not alleged that MSU has received federal financial assistance, and Defendants have not responded otherwise. Thus, her claims could be dismissed on this basis alone. *See, e.g.*, *Cambridge v. Lawson Software, Inc.*, No. CIV.A.3:01-CV-2830-K, 2003 WL 22081372, at *1 (N.D. Tex. Aug. 25, 2003) (dismissing plaintiff's RA claim under Rule 12(b)(6) for failure to allege defendants either entered into federal contracts or received federal financial assistance).

Wren also fails to allege plausible facts to substantiate other elements of her RA claim. To state a valid RA claim, Wren must allege that she was: (1) an "individual with a disability"; (2) "otherwise qualified" for the program; and (3) excluded from, denied the benefits of, or otherwise subjected to discrimination under the program "solely by reason of her . . . disability." 29 U.S.C. § 794(a). Wren claims that she is disabled because of her severe allergies. (ECF No. 7 at 17). She claims that MSU discriminated against her by forcing her to show "above and beyond" evidence of those allergies. (*Id.*). She alleges that MSU instructed her to provide records from an emergency

14

room visit that occurred more than ten years previously to prove her severe allergic reaction to tetanus and flu vaccinations. (*Id.* at 17). Wren alleges that after she was unable to provide the medical records, she was forced to withdraw from the FNP because MSU did not provide her with an accommodation (*Id.* at 18). However, MSU admitted her back into the FNP in November 2014 after she submitted paperwork substantiating her immunization exemption and told her that the "compliance issue" was closed. (*Id.*). But questions reemerged regarding her immunization exemption prior to the 2016 FNP II clinical practicum examination. (*Id.*). Wren claims that Defendants retaliated against her by giving her an ultimatum to either obtain the required vaccinations or be dismissed from the program. (*Id.*). She further alleges that MSU and Williamson discriminated against her by requiring that she prove the severity of her allergy disability even though the documents she provided were sufficiently clear. (*Id.*).

### A.     Wren does not allege a qualified disability.

Under both the ADA and RA, any person with a "disability," as defined by the ADA, is an "individual with a disability." 29 U.S.C. § 794; 705(20)(B). The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1). MSU contends that Wren's FAC fails to allege (1) allergies that substantially limit one or more major life activities, much less identify any specific major life activity; (2) any records of her allergy impairment; and (3) that her allergies are not regarded as a disability. (ECF No. 17 at 40–41). Wren claims that she receives disability compensation from the Veteran's Administration, although she did not disclose for what disability; she meets the definition of someone with a disability; and she argues that "allergies" qualify as a major bodily function of the immune system and as such can be construed to meet the definition of "disability."

(ECF No. 22 at 2). Wren contends that her allergies are controlled by medication, diet, and environmental restrictions, and that her allergies and treatment affect and limit major life activities, including eating, sleeping, and breathing. (*Id.* at 3). For example, Wren alleges that she keeps an epi-pen on her person, follows a restrictive diet, and takes multiple medications to control her allergies. (*Id.* at 17).

Although the ADA's definition of "disability" is to be broadly construed in favor of coverage to the "maximum extent permitted by the terms of [the statute]," Wren has not plausibly alleged that she is disabled. 42 U.S.C. § 12102(4)(A). Under subsection A, Wren must allege that she (1) has a mental or physical impairment that (2) substantially limits (3) a major life activity. *Id.* (1)(A). A "major life activity" includes, but is not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* (2)(A). Even assuming that Wren's allergies result in a physical impairment, she has not alleged how her allergies substantially limit a major life activity. Although she lists major life activities that are impacted by her allergies, Wren does not allege how her allergies substantially limit them. Nor has she alleged facts or identified a record indicating that her allergies substantially limit a major life activity or that her allergies were regarded as such. Accordingly, her RA claims should be dismissed.

**B.    Wren does not allege that she is "otherwise qualified."**

To be "otherwise qualified," Wren must allege facts that she met the FNP's essential requirements, with or without a reasonable accommodation. *Shaikh v. Texas A&M Univ. Coll. of Med.*, 739 F. App'x 215, 220 (5th Cir. 2018) (per curiam) (citing *McGregor v. La. State Univ.*, 3 F.3d 850, 855 (5th Cir. 1993)). An "essential" requirement is one that, if removed, would alter the

fundamental nature of the program. *Id.* Wren's complaint alleges that she was readmitted to the FNP in November 2014 after submitting a compliant affidavit providing an exemption from immunizations for reasons of conscience. (ECF No. 7 at 5). But the day before taking the FNP II clinical practicum exam in the spring of 2016, she was notified via email that her immunization documentation was insufficient and that she would be dismissed from the FNP if her vaccinations were not up to date. (*Id.* at 8). However, Wren concedes that she participated in the FNP II clinical practicum and took the clinical practicum exam, but obtained a failing grade that precluded her from continuing in the FNP. (*Id.* at 9, 12). Wren's FAC suggests that she was not otherwise qualified to continue in the FNP because she had not passed the clinical practicum, not because of her disability. Accordingly, Wren has not alleged facts to support her claim that she was otherwise qualified to continue in the FNP.

### C.    Wren does not allege that she was discriminated against "solely by reason of her disability."

To recover under the RA, Wren must allege facts to establish that she was discriminated against solely because of her severe allergies. 29 U.S.C. § 794(a). This requires a "causal connection" between Wren's disability and Defendants' allegedly discriminatory conduct, and Wren's disability must be the "only cause" of Defendants' conduct. *Shaikh*, 739 F. App'x at 222 (citing *Sedor v. Frank*, 42 F.3d 741, 746 (2d Cir. 1994)). If Defendants' conduct was "motivated at least in part by a factor other than [Wren's] disability, the [RA] claim must be rejected." *Sedor*, 42 F.3d at 746.

Wren's complaint is not clear as to which of Defendants' conduct—application of MSU's immunization policy or her allegedly coerced withdrawal from the FNP—was caused by Wren's disability. Wren complains that Defendants discriminated against her by requiring proof of her immunization before participating in the FNP and requesting medical verification of her disability.

(ECF No. 7 at 17). The state of Texas requires "students entering, attending, enrolling in, and/or transferring to . . . institutions of higher education," like MSU, to be vaccinated. 25 Tex. Admin. Code § 97.61 (West 2018). A student may seek an exclusion from the vaccination requirement by presenting a "completed, signed and notarized affidavit" stating that the student declines to be vaccinated for reasons of conscience. *Id.* § 97.62(2). Such an affidavit is valid for a two-year period. *Id.* A student may also claim an exclusion for medical reasons that must be supported by an exemption statement signed by a licensed physician who examined the student. *Id.* § 97.62(1). An exemption statement is only valid for one-year unless it states that a lifelong condition exists. *Id.* Wren alleges that she last submitted an exemption with her application to the FNP in 2011. (ECF No. 7 at 7). She complains that Defendants harassed and discriminated against her for not obtaining tetanus and flu vaccinations. (*Id.*). She does not allege the date of the exemption in her 2011 application, when the alleged harassment and discrimination occurred, or if a proper medical exclusion was on file with MSU that complied with § 97.62(1). Further, Wren's FAC alleges that after she submitted the proper affidavit that stated she declined to be immunized for reasons of conscience, MSU readmitted her to the program. (ECF No. 7 at 18). It appears that Defendants' alleged "harassment and discrimination" consisted of attempting to verify Wren's exemption from compliance with Texas' immunization requirements. Thus, Wren's alleged disability is not the only cause for Defendants' conduct.

Wren also alleges that Defendants discriminated against her by coercing her to withdraw from the FNP. (*Id.* at 13). But Wren stated that she withdrew from the program to "preserve good standing in hope[s] of possibly transferring to a different graduate school in the future." (*Id.* at 13). Further, Wren alleged that her grades from the clinical practicum did not meet MSU's threshold for continuing in the program, and that Defendants discriminated against her based upon her race.

(*Id.* at 12, 19–22). Thus, Wren alleges multiple reasons, other than her disability, that could have caused MSU to administratively withdraw her from the FNP. Accordingly, because Wren's disability is not the only cause of Defendants' allegedly discriminatory conduct, her RA claim should be dismissed.

## IV.    Title II of the ADA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Thus, to state a valid Title II claim, Wren must allege: (1) she has a qualifying disability; (2) she is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) such discrimination is due to her disability. *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011) (per curiam). Title II of the ADA "applies to public entities regardless of whether they receive federal funds," implicating Congress's power to abrogate state sovereign immunity. *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 276 n.4 (5th Cir. 2005) (en banc). Thus, Congress may abrogate Texas' sovereign immunity if it exercises its power under section 5 of the Fourteenth Amendment. *Shaikh*, 739 F. App'x at 224 (citing *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003)).

To determine whether Congress has abrogated a state's sovereign immunity the Court applies a three-part inquiry under *United States v. Georgia*, 546 U.S. 151 (2006). Step one is to determine which aspect of Defendants' conduct violated Title II. *Id.* at 159. Step two is to determine to what extent Defendants' conduct also violated the Fourteenth Amendment. *Id.* At this step, if Defendants' conduct violated both Title II and a constitutional guarantee, then there is no sovereign immunity, but if the Defendants' conduct violated neither, then the claim must fail.

*Duncan v. Univ. of Texas Health Sci. Ctr. at Houston*, 469 F. App'x 364, 367 (5th Cir. 2012) (per curiam). In step three, if Defendants' conduct violated Title II and not a constitutional guarantee, then the Court will determine "whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.* (citing *Hale*, 642 F.3d at 498).

Wren's Title II claim is premised on the same facts underlying her RA claim. The only material difference, for this case, between Title II of the ADA and the RA is the causation requirement. *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). Under the ADA, Wren's disability need not be the sole cause of Defendants' discriminatory conduct for her claim to be viable. *Id.* But as discussed above, Wren has failed to allege that she has a qualified disability. Although Wren alleges that she was coerced into withdrawing from the FNP because she refused to be immunized, she does not allege how Defendants used Texas' immunization requirements in a discriminatory manner. Thus, Wren's allegations do not establish a violation of Title II.

Nor does this conduct violate the Fourteenth Amendment. The due process clause of the Fourteenth Amendment prohibits any state from "depriv[ing] any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, § 1, and "has been viewed as guaranteeing procedural due process and substantive due process," *John Corp. v. City of Houston*, 214 F.3d 573, 577 (5th Cir. 2000). Defendants argue that Wren does not have a property or liberty interest in post-high school education. However, the Supreme Court and the Fifth Circuit have assumed, without deciding, that students have a constitutionally protectible interest in continued higher education enrollment. *See Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 222–23 (1985) (even if university student's "assumed property interest gave rise to a substantive right under the Due Process Clause to continued enrollment free from arbitrary state action, the facts of

record disclose no such action"); *Shaboon v. Duncan*, 252 F.3d 722, 730 (5th Cir.2001) (assuming, without deciding, that a medical resident had protected due process interest in his position). Accordingly, the undersigned will also assume that Wren has a protectible interest in her continued enrollment at MSU.

In an academic setting, due process requirements differ if the student was dismissed for disciplinary reasons or for academic reasons. *Shah v. Univ. of Texas Sw. Med. Sch.,* 54 F. Supp. 3d 681, 692 (N.D. Tex. 2014). If a student is dismissed for disciplinary reasons, then "the student [should] be given [an] oral or written notice of the charges against [her] and, if [s]he denies them, an explanation of the evidence the authorities have and an opportunity to present h[er] side of the story." *Goss v. Lopez,* 419 U.S. 565, 581 (1975). In contrast, due process does not require a hearing before dismissing a student for failure of academic performance or a right of appeal before dismissing a student for poor performance. *Shah*, 54 F. Supp. 3d at 692 (citing *Horowitz*, 435 U.S. at 90 (hearing) and *Yoder v. Univ. of Louisville*, 526 F.App'x. 537, 551 (6th Cir. 2013) (appeal)). Wren's FAC does not allege facts supporting any lack of due process. She fails to allege any facts stating that Defendants should have followed some other process before notifying her that her immunization records were out of compliance. Further, her own allegations suggest that Defendants took reasonable steps to confirm the severity of her allergies to comply with Texas' immunization statute. This is supported by Wren's statement that once she submitted the proper affidavit declining to be vaccinated for reasons of conscience, she was allowed to reenroll in the FNP program. Thus, Wren has failed to allege a due process violation.

Because Wren failed to allege that Defendants' conduct violated Title II and the Due Process clause, there is no abrogation of sovereign immunity and Wren's Title II claim should be dismissed for lack of subject matter jurisdiction.

### V.    Statue of Limitations

The Court also notes that as currently pleaded, Wren's Title VI and associated §§ 1981, 1983, and 1985 claims, and her Title II and RA claims appear to be time barred. For these claims, the state's general personal injury limitations period applies, which in Texas is two years. *Helton v. Clements*, 832 F.2d 332, 334 (5th Cir. 1987) (§§ 1981, 1983, 1985, and 1988); *Griffin v. Round Rock Indep. Sch. Dist.*, 82 F.3d 414, 1996 WL 166999, at *1 (5th Cir. 1996) (per curiam) (unpublished) (Title VI); *Frame v. City of Arlington*, 657 F.3d 215, 237 (5th Cir. 2011) (Title II and the RA); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a) (West 2017). However, federal law governs when a discrimination claim accrues, which is when "the plaintiff knows or has reason to know of the injury that is the basis of [her] complaint." *Helton*, 832 F.2d at 334–35.

Wren filed her original complaint on April 30, 2018. (ECF No. 1). Her FAC states that she withdrew from the FNP and requested an investigation into her discrimination and retaliation claims in April 2016. (ECF No. 7 at 14). It is unclear when in April 2016 Wren was on notice that she should withdraw or be administratively dismissed from the FNP. Defendants, however, point to the United States Department of Education Office for Civil Rights investigation report, dated May 25, 2017, indicating that Wren was notified by MSU that she had failed the clinical practicum on March 29, 2016. (ECF No. 18 at 12). In her response, Wren provided a more detailed timeline of events. She stated she "alluded" to a discrimination complaint at the Dean of Student Affairs office on March 29, 2016, and that she formally requested an investigation on April 5, 2016. (ECF No. 22 at 8). Also on April 5, 2016, Wren was instructed by MSU to withdraw or be administratively dropped from the FNP program. (*Id.*). According to Wren, she was coerced into withdrawing from the FNP on April 6, 2016. (*Id.*). From this timeline of events, it appears that Defendants' alleged discriminatory conduct that resulted in her "coerced" withdrawal occurred

more than two years before she filed her original complaint. Wren's Title II and RA claims also appear to be time barred because Defendants' discriminatory conduct based upon her disability occurred before she took the clinical practicum exam. Accordingly, these claims appear to be time-barred and should be dismissed.

Wren's defamation claim, whether libel or slander, has a limitations period of one year. Tex. Civ. Prac. & Rem. Code Ann. § 16.002(a) (West 2017). Limitations run from the date of publication or communication and "not from the date of consequences." *Ellert v. Lutz*, 930 S.W.2d 152, 156 (Tex. App.—Dallas 1996, no writ). Wren's defamation and libel claims focus on the events surrounding her clinical practicum exam. (ECF No. 7 at 26–27). These events occurred during March of 2016. (ECF No. 18 at 4, 12). Even if the Court were to assume that the limitations period ran from the date she received her clinical practicum grade sheet on November 29, 2016, her claim still would be time barred. Accordingly, Wren's defamation claims should be dismissed.

## VII.    Wren's claims should be dismissed without prejudice.

Although the Court should dismiss a complaint without prejudice in most cases, a plaintiff must have some "viable avenue to recover" according to which the plaintiff could amend the complaint. *See Parker v. Allstate Ins. Co.*, 3:16-CV-00892-CWR-FKB, 2017 WL 4287912, at *1 (S.D. Miss. Sept. 27, 2017). When a plaintiff has alleged her best case, then dismissal with prejudice is appropriate. *Jones*, 188 F.3d at 326–27.

As alleged in her FAC, Wren's Title II claim, Texas state law claims, potential claim under section 97.62 of Title 25 of the Texas Administrative Code, constitutional claims, and §§ 1981, 1983, and 1985 claims are barred by Eleventh Amendment immunity. The Fifth Circuit has "repeatedly referred to the Eleventh Amendment's restriction in terms of subject matter jurisdiction." *United States v. Texas Tech Univ.*, 171 F.3d 279, 286 n.9 (5th Cir. 1999) (citing

*Warnock v. Pecos County, Texas*, 88 F.3d 341, 343 (5th Cir. 1996)). Thus, any of Wren's claims that are barred by Eleventh Amendment immunity should be dismissed without prejudice because the Court lacks subject matter jurisdiction. *Anderson v. Jackson State Univ.*, 675 F. App'x 461, 464 (5th Cir. 2017) (per curiam) (citing *Warnock*, 88 F.3d at 343).

Wren filed a lengthy, detailed complaint, but has only amended her complaint one time to add a new defendant. She should be afforded an opportunity to overcome the deficiencies enumerated in this order so that she can allege her best case, but only if the amendment would not be futile.

## CONCLUSION

After considering the pleadings and applicable law, the undersigned **RECOMMENDS** that O'Connor **GRANT** Defendants' Motion to Dismiss (ECF No. 16); **DISMISS** Plaintiff's claims **without prejudice**; and allow Plaintiff an opportunity to file an amended complaint within the fourteen days allotted for objections to this recommendation. If, however, Plaintiff files an amended complaint within the prescribed time period, the Motion should be **DENIED** as moot, and the action should be allowed to proceed on the amended complaint.

A copy of this Findings, Conclusions, and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Findings, Conclusions, and Recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b)(1). In order to be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific written objections will bar the aggrieved party from appealing the factual

findings and legal conclusions of the magistrate judge that are accepted or adopted by the district

court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d

1415, 1417 (5th Cir. 1996) (en banc).

Signed January 23, 2019.

_____
Hal R. Ray, Jr.
UNITED STATES MAGISTRATE JUDGE