**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **REGINA WREN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 7:18-cv-00060-O-BP** |
| | § | |
| **MIDWESTERN STATE** | § | |
| **UNIVERISTY,** *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Before the Court are Defendants Midwestern State University, Keith Williamson, James Johnston, Kathleen Williamson, Debra Walker, Julia Knauff, and Kristina Halberg's Second Motion to Dismiss (ECF No. 32) filed March 8, 2019, their Corrected Brief in Support (ECF No. 37) filed March 11, 2019, and Plaintiff Regina Wren's Brief in Opposition of Defendants' Motion to Dismiss (ECF No. 46) filed March 25, 2019. Pursuant to Special Order No. 3, the case was referred on April 30, 2018 to the undersigned for pretrial management, including the determination of non-dispositive motions and issuance of findings of fact and recommendations on dispositive motions. (ECF No. 5). After considering the pleadings and applicable legal authorities, the undersigned **RECOMMENDS** that United States District Judge Reed O'Connor **GRANT** Defendants' Second Motion to Dismiss; **DISMISS WITHOUT PREJUDICE** Plaintiff's claims against MSU and the individual Defendants in their official capacities for lack of subject matter jurisdiction; **DISMISS WITH PREJUDICE** Plaintiff's claims against the Defendants in their individual capacities for failure to state a claim; and **DECLINE** to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims.

## BACKGROUND

Plaintiff Regina Wren ("Wren"), a nursing student formerly enrolled in MSU's Family Nurse Practitioner program ("FNP"), sued Defendants Midwestern State University ("MSU"); Keith Williamson ("Williamson"), Medical Director; Debra Walker ("Walker"), Graduate Coordinator; Julia Knauff ("Knauff"), Associate Professor; and Kristina Halberg ("Halberg"), Instructor for alleged discrimination and retaliation against Wren based on her disability status and race. Wren's First Amended Complaint ("FAC") focused on MSU's immunization and double-grading policies that she contended were used against here and caused her to fail a required clinical practicum that eventually led to her withdrawal from the FNP. On January 23, 2019, the undersigned recommend that Judge O'Connor grant Defendants' first motion to dismiss, but allow Wren an opportunity to file an amended complaint within the fourteen days allotted for objections to the recommendation. Wren timely filed her Second Amended Complaint ("SAC"), adding two new defendants, James Johnston ("Johnston"), Dean, Provost, and Vice President for Academic Affairs at MSU and Dr. Kathleen Williamson ("Professor Williamson"), Chair, MSU Wilson School of Nursing. (*See* ECF No. 25). Wren's theories of recovery against the Defendants in the SAC are substantially similar to her FAC. Wren has, however, abandoned her claims under 42 U.S.C. §§ 1981 and 1985 and state-law claims for defamation and libel.

The following narrative is taken from the SAC. In the Fall of 2011, Wren enrolled in the three-year FNP offered by MSU at the Wilson School of Nursing. (ECF No. 25 at 7). Before being admitted to the FNP and accruing clinical hours, a nursing student, like Wren, must submit a compliance packet that showed proof of immunization or a qualified exemption from immunization. (*See id.* at 9). In September 2011, Wren submitted her employer's immunization records to the Vincent Health Center ("VHC"), the campus student health clinic that determined

whether submittals complied with MSU's immunization policy. (*Id.* at 7–8). Wren alleges the 2011 compliance packet "indicated" an approved exemption to the flu vaccine. (*Id.* at 8). Apparently, Wren's application was acceptable to MSU because Wren was admitted into the FNP and progressed without incident until the Spring 2013 semester. (*Id.* at 7).

Some of the FNP courses require a clinical practicum in addition to classroom instruction. In the Spring of 2013, Wren took a Health Assessment course that required a clinical practicum exam. Wren did not receive a passing grade on the clinical practicum exam, and as a result, she did not earn a passing grade for the Health Assessment course after her classroom and clinical practicum scores were averaged. (*Id.* at 7). Because it was a required course, Wren was unable to progress in the FNP until she earned a passing grade. MSU did not offer the Health Assessment course again until the spring of 2014 so Wren did not enroll in any classes during the 2013 summer and fall semesters. (*Id.*). Wren reenrolled in the Health Assessment course and passed in the spring of 2014. (*Id.* at 8). She took and passed classes during the summer and submitted another compliance packet to be enrolled in the FNP I course.

As part of the FNP I course, Wren was required to log 192 hours at a clinic with an approved instructor. (*Id.*). Wren's clinic and instructor were located in Dallas, Texas. (*Id.*). After enrolling in the FNP I course, VHC had concerns about Wren's immunization exemption and informed Wren that her employer's immunization records were not sufficient to prove the exemption applied to the tetanus and flu vaccines. (*Id.* at 9). VHC requested additional information concerning her immunization exemption from her primary care physician at the Dallas VA Medical Center. (*Id.*). After reviewing the documents Wren submitted and discussing them with her primary care physician, VHC denied her access to the clinic because the paperwork submitted did not comply with MSU's requirements. (*See id.* at 9). VHC allegedly asked Wren for medical

records substantiating her severe allergic reaction to vaccinations. (*Id.* at 9). Wren neither submitted the appropriate medical records nor obtained the required vaccinations. (*Id.* at 9). She dropped the FNP I course in October 2014. (*Id.* at 10). However, in November 2014, she submitted the proper affidavit that stated that she declined to be immunized for reasons of conscience. (*Id.*). Shortly thereafter, MSU accepted the affidavit, and Wren reenrolled in FNP I for the Fall 2015 semester. (*Id.* at 11).

After completing FNP I, Wren enrolled in the Spring 2016 FNP II course. Like FNP I, FNP II required students to log clinical hours and to complete a clinical practicum examination. Wren, who is African-American, and another African-American student (Wren refers to this student as "Student A"), were switched to Halberg's clinical group for the FNP II course. (*Id.*). Halberg's clinical group consisted of only three students, all of whom were female. The third student in Wren's group was Caucasian. (*Id.*). Although not entirely clear, Wren indicates the only student approved to accrue clinical hours in Halberg's clinic, which is in Wichita Falls, Texas, was a different Caucasian ("Student C") student who resided in Wichita Falls and was not part of Halberg's clinical group. (*Id.* at 12, 18). Confusingly though, Halberg is Student C's FNP II course instructor. (*Id.* at 12).

Wren alleges that Halberg was immediately hostile to her and Student A. (*Id.* at 11). Despite Wren's allegations that she had received a grade of 100 from Walker on her first major written didactic assignment, received a grade of 90 from Halberg on her first major written clinical assignment, and had an "A" average in both the classroom and clinical portions of FNP II, she, along with other students, filed a complaint with the Office for Civil Rights complaining about harsh grading practices in comparison to those experienced by Caucasian students. (*Id.* at 11–12). She alleges that the complaints were not finalized due to fear of retribution. (*Id.* at 12).

4

The day before Wren was to take the FNP II clinical practicum midterm examination, Halberg sent her an email indicating that her written clinical assignment was graded lower because she did not submit it on time. (*Id.* at 13). The email also informed Wren that she had failed to follow instructions to confirm the time of her clinical practicum examination at least twenty-four hours in advance, even though Wren alleges she and Student A had previously arranged to take the clinical practicum exam. (*Id.* at 12–13). Wren also received a communication from the Wilson School of Nursing requesting compliance documents for vaccinations and a drug screen. (*Id.* at 12).

On the day of the clinical practicum examination, Wren and Student A arrived at Halberg's clinic well before noon, but were forced to wait for over an hour in the lobby while Student C was seeing patients. (*Id.* at 13). At this time, Student C collected their clinical journals for Halberg. (*Id.* at 14). Presumably, Halberg was waiting for Knauff to arrive so that Wren and Student A could be "double-graded." (*Id.*). Wren and Student A were the only FNP II students in their class to be double-graded. (*Id.* at 14). When Wren asked Halberg why Knauff was there, he answered, "To help me with y'all." (*Id.* at 14). During the exam, which lasted one hour, Halberg and Knauff limited Wren to a single textual reference. (*Id.*). She claims that no other student was limited to a single reference. (*Id.*). As a result, Wren and Student A obtained a failing grade on the clinical practicum exam. (*Id.*). Wren scored a 49 from Knauff and 53 from Halberg. (*Id.*). After receiving the scores, Wren stated to Knauff, "This is why you are here, to fail us." (*Id.*). Knauff responded, "No[,] not you. You were doing so well." (*Id.*).

Both students retook the clinical practicum examination with a different instructor who allowed them to use more than one resource during the exam. (*Id.* at 15). Wren received an 83 on the second examination, but when her scores were averaged, she still failed to obtain a passing

grade of 80. (*Id.*). Even though the exam was only a midterm, she was precluded from completing the course. Wren claims that she was "coerced" into withdrawing from the FNP II course. (*Id.* at 16).

Wren raises many claims in her SAC against all Defendants for violations of Title II of the Americans with Disabilities Act ("ADA") as amended by the ADA Amendment Act of 2008 ("ADAAA"), violations of Section 504 of the Rehabilitation Act ("RA"), violations of Title VI of the Civil Rights Act of 1964, counts under 42 U.S.C. § 1983, substantive due process and equal protection violations under the Fourteenth Amendment to the U.S. Constitution, free speech violations under the First Amendment, and state law claims for breach of fiduciary duty, violations of Title 25 of the Texas Administrative Code Section 97.62 ("Section 97.62"), breach of implied contract, intentional infliction of emotional distress, and fraud. She seeks undisclosed prospective injunctive relief, compensatory damages, exemplary damages, and severe mental anguish and emotional distress damages for Defendants' conduct that led to her dismissal from the FNP.

After Wren filed her SAC, adding Defendants Johnston and Professor Williamson, Defendants filed their Second Motion to Dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) and for failure to state a claim upon which relief may be granted under Rule 12(b)(6). Wren responded to the Motion, but Defendants did not file a reply. The Motion is now ripe for disposition.

## LEGAL STANDARD

### I.    Federal Rule of Civil Procedure 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to move for dismissal of a complaint based on lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Because "[f]ederal courts are courts of limited jurisdiction[, t]hey possess only that power authorized by

Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). If a Court lacks subject matter jurisdiction, it must dismiss the action. Fed. R. Civ. P. 12(h)(3). In determining whether subject matter jurisdiction exists, a court "must presume that a suit lies outside this limited jurisdiction, and the burden of establishing federal jurisdiction rests on the party seeking the federal forum." *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *CleanCOALition v. TXU Power*, 536 F.3d 469, 473 (5th Cir. 2008) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)).

"When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977)). When considering a Rule 12(b)(1) motion, the court may consider evidence beyond the pleadings. *Moran v. Kingdom of Saudi Arabia,* 27 F.3d 169, 172 (5th Cir. 1994). "The district court may dismiss for lack of subject matter jurisdiction based on (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Lowe v. ViewPoint Bank*, 972 F. Supp. 2d 947, 953 (N.D. Tex. 2013) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

A dismissal under Rule 12(b)(1) is without prejudice because it "is not a determination of the merits and does not prevent the plaintiff from pursuing a claim in a court that does have proper jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

## II.    Federal Rule of Civil Procedure 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted. The Rules require that each claim contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a). A complaint must include sufficient factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In considering a Rule 12(b)(6) motion, courts "take all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff . . . and ask whether the pleadings contain 'enough facts to state a claim to relief that is plausible on its face.'" *Yumilicious Franchise, L.L.C. v. Barrie*, 819 F.3d 170, 174 (5th Cir. 2016) (citing *Twombly*, 550 U.S. at 547). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

There exists a "well-established policy that the plaintiff be given every opportunity to state a claim." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977)). It is federal policy to decide cases on the merits rather than technicalities, and thus when possible the Fifth Circuit has recommended that suits be dismissed without prejudice on Rule 12 motions. *Great Plains Tr. Co.*, 313 F.3d at 329; *Hines v. Wainwright*, 539 F.2d 433, 434 (5th Cir. 1976) (vacating and remanding a Rule 12(c) dismissal with instructions to the district court to dismiss without, instead of with, prejudice). As a result, courts generally allow plaintiffs at least one opportunity to amend following a Rule 12 dismissal on the pleadings. *See, e.g.*, *Great Plains Tr. Co.*, 313 F.3d at 329; *see In re Online Travel Co.*

*(OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 548–49 (N.D. Tex. 2014) (Boyle, J.) (dismissing for failure to state a claim without prejudice, as dismissing with prejudice would be "too harsh a sanction").

A *pro se* plaintiff's pleadings are liberally construed. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A "*pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Id.* However, if the court determines that a plaintiff has pleaded his or her best case, a district court does not err in dismissing a *pro se* complaint with prejudice. *Jones v. Greninger*, 188 F.3d 322, 326–27 (5th Cir. 1999) (citing *Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986); *Bazrowx v. Scott*, 136 F.3d 1053, 1054 (5th Cir. 1998)).

## ANALYSIS

### I.    The Eleventh Amendment bars claims against MSU and the individual Defendants in their official capacities.

Under the Eleventh Amendment, states may not be sued in federal court unless they unequivocally consent to the suit or unless Congress, pursuant to a valid exercise of power, unequivocally expresses its intent to abrogate immunity. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99–100 (1984). Eleventh Amendment immunity extends to state agencies and to state officials if the relief sought would operate against the state. *Id.* at 101.

Defendants claim that MSU is an agency of the state of Texas and is, therefore, entitled to Eleventh Amendment immunity barring Wren's claims. Defendants' contention is well-founded as MSU is a "[g]eneral academic teaching institution" and is under the organization, control, and management of MSU's board of regents. Tex. Educ. Code. Ann. § 61.003(3) (West Supp. 2018); *Id.* § 103.02 (West 2002). Further, Wren's SAC states that "MSU is a Texas educational institution formed under the laws of the [s]tate of Texas[.]" (ECF No. 25 at 3). Therefore, MSU is an agency of the state of Texas and is entitled to Eleventh Amendment immunity. *Lewis v. Midwestern State*

*Univ.*, 837 F.2d 197, 198 (5th Cir. 1988). And the individual Defendants sued in their official capacities also are entitled to Eleventh Amendment immunity because "the state is the real, substantial party in interest." *Pennhurst*, 465 U.S. at 101; *Union Pac. R. Co. v. Louisiana Pub. Serv. Comm'n*, 662 F.3d 336, 340 n.3 (5th Cir. 2011) (per curiam) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.") (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).

There are three possible exceptions to Eleventh Amendment immunity: (1) for claims seeking injunctive or declaratory relief against a state official under *Ex Parte Young*, 209 U.S. 123 (1908); (2) a state's waiver or consent, *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 267 (1997); and (3) Congress's abrogation of the state's immunity through section 5 of the Fourteenth Amendment, *Bd. of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356, 364 (2001).

### A.    Exceptions to Eleventh Amendment Immunity

#### 1.    Application of *Ex Parte Young*

*Young* permits "prospective injunctive relief to prevent a continuing violation of federal law" against state officers in their official capacities and does not allow damages or other retrospective relief. *Green v. Mansour*, 474 U.S. 64, 68 (1985). Wren has pleaded for undisclosed prospective injunctive relief. (ECF No. 25 at 1, 38). However, her claim for injunctive relief is neither directed to any state official with responsibility for enforcing any of the provisions Defendants have allegedly violated, nor does she specify the type of injunctive relief requested. And Wren clearly requests retrospective relief for her dismissal from the FNP as she seeks undisclosed monetary compensation under every count alleged. (*Id.* at 25, 28, 29, 31, 32, 33, 35, 36, 38). Further, she has failed to allege which of the counts asserted against the Defendants are

ongoing violations of federal law. Thus, the exception to Eleventh Amendment immunity under *Ex Parte Young* is unavailable to her on all claims.

### 2.    Texas state law claims

Wren neither pleaded nor directed the Court to authority showing that the state of Texas has waived immunity or consented to suit for Texas state law claims. Indeed, Congress has not abrogated Texas' Eleventh Amendment immunity for breach of contract or tort claims, and Texas has not consented to suit in federal court. *See Duncan v. Univ. of Texas Health Science Ctr. at Hous.*, 469 F. App'x. 364, 366 & n.3 (5th Cir. 2012) (per curiam) (Texas contract and tort claims against a state university were barred by sovereign immunity); *Kitchens v. Tex. Dep't of Human Res.*, 747 F.2d 985, 986 (5th Cir. 1984) (contract claims); *Sherwinski v. Peterson*, 98 F.3d 849, 852 (5th Cir. 1996) (tort claims); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 101.057 (West 2011) (explicitly not providing for a waiver under the Texas Torts Claims Act for intentional torts).

Accordingly, Wren's breach of implied contract, breach of fiduciary duty, intentional infliction of emotional distress, and fraud claims as asserted against MSU and the individual Defendants in their official capacities are barred by Eleventh Amendment immunity and should be dismissed.

Wren also alleges a claim under section 97.62 of Title 25 of the Texas Administrative Code. Section 97.62 provides for individual exclusions from Texas' immunization requirements in public or private primary or secondary schools or institutions of higher education. The statute does not, however, provide a private right of action for a failure to grant an immunization exception to a student. Nor does Wren allege that Texas has waived or consented to potential liability under section 97.62. It is well-settled Texas law that for a statute to waive liability, the waiver must be in clear and unambiguous language. *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 696

(Tex. 2003) (citing Tex. Gov't Code § 311.034). Wren has not directed the Court to such a waiver, nor is the Court aware of any. Accordingly, Wren's Section 97.62 claim asserted against MSU and the individual Defendants in their official capacities is barred by Eleventh Amendment immunity. Moreover, to the extent Wren asserts a Section 97.62 claim against the Defendants other than MSU in their individual capacities, the claim is not based in law and should be dismissed.

### 3.    Constitutional and 42 U.S.C. § 1983 Claims

Wren neither pleaded nor directed the Court to authority showing that the state of Texas has waived immunity or consented to suit for claims alleged under 42 U.S.C. § 1983. The law is clear that Texas has not waived immunity or consented to suit under § 1983. *See, e.g.*, *Quern v. Jordan*, 440 U.S. 332, 338 n.7 (1979) ("§ 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States[.]"); *Baldwin v. Univ. of Texas Med. Branch at Galveston*, 945 F. Supp. 1022, 1030 (S.D. Tex. 1996) ("Congress did not abrogate the states' Eleventh Amendment immunity by enacting 42 U.S.C. §§ 1981, 1983, and 1985."). Accordingly, Wren's § 1983 against MSU and the individual Defendants in their official capacities are barred by Eleventh Amendment immunity and should be dismissed.

So too are Wren's constitutional claims barred by Eleventh Amendment immunity. For state officials sued in their official capacities, like the individual Defendants, the proper vehicle to assert constitutional claims is through § 1983. *See Hearth, Inc. v. Dep't of Pub. Welfare*, 617 F.2d 381, 383 (5th Cir. 1980); *Shah v. Univ. of Texas Sw. Med. Sch.*, 129 F. Supp. 3d 480, 494 n.9 (N.D. Tex. 2015) (noting that § 1983 provides the means for seeking relief against a state actor who violates the Constitution). And as already discussed, Wren has not properly pleaded for prospective injunctive to invoke the exception under *Young*. Even if Texas had waived its Eleventh Amendment immunity, a university is not a "person" under § 1983 and MSU is, therefore, not a

12

proper defendant. *Stotter v. Univ. of Texas at San Antonio*, 508 F.3d 812, 821 (5th Cir. 2007). Accordingly, Wren's First Amendment retaliation, due process, and equal protection claims asserted against MSU and individual Defendants in their official capacities are barred by Eleventh Amendment immunity.

## II.    Title VI of the Civil Rights Act of 1964

Wren has sued Defendants for violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*. ("Title VI"). (ECF No. 25 at 26–28). The undersigned notes that Wren's pleading has caused confusion regarding which claims she is asserting. The heading under which she asserts her race-based discrimination claims reads as follows: "Discrimination-Race/Nationality in Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 1983, 2000d-7. ("Title VI") Against MSU et al." (*Id.* at 26). Because section 1983 itself is not an independent cause of action, but is rather a vehicle to challenge alleged violations of federal statutory or constitutional rights, the undersigned construes Wren's race-based discrimination claim in this section under Title VI. *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 412 (5th Cir. 2015) (section 1983 does not provide any substantive rights, but provides a method for vindicating already conferred federal rights). Under counts separate from this one, Wren has alleged Defendants violated her constitutional due process, equal protection, and First Amendment rights, which can only be brought through section 1983. Those constitutional claims asserted against Defendants in their official capacities previously were discussed. As asserted against Defendants in their individual capacities, those claims are discussed later in this recommendation.

Although Wren has not pleaded any facts showing that Texas waived immunity or consented to suit under Title VI or that Congress abrogated Texas' immunity under section 5 of the Fourteenth Amendment, Congress has abrogated the states' Eleventh Amendment immunity

for a violation of Title VI. 42 U.S.C. § 2000d-7. Wren asserts her Title VI claim against all Defendants, but she only makes allegations against Halberg, Knauff, Walker, Professor Williamson, and Johnston.

Title VI provides, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Because "only public and private entities can be held liable under Title VI," Wren's claims against the individual Defendants must be dismissed. *Price v. La. Dep't of Educ.*, 329 F. App'x 559, 561 (5th Cir. 2009) (per curiam). Wren, however, has alleged that MSU receives federal financial assistance. Thus, the undersigned will analyze whether Wren has alleged "[MSU] engaged in *intentional* discrimination based on race, color, or national origin . . . ." *Pathria v. Univ. of Texas Health Sci. Ctr. at San Antonio*, 531 F. App'x 454, 455 (5th Cir. 2013) (per curiam) (emphasis in original).

Wren's Title VI claim must set forth "specific allegations of acts that were taken with discriminatory intent[.]" *Mohamed for A.M. v. Irving Indep. Sch. Dist.*, 252 F. Supp. 3d 602, 627 (N.D. Tex. 2017) (citation omitted). To survive a motion to dismiss, Wren's allegations must also create a reasonable inference that MSU's discriminatory conduct was motived by race, color, or national origin. *See Pathria*, 531 F. App'x at 455 (citing *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)). Entities, such as MSU, cannot be held vicariously liable under Title VI. *Mohamed*, 252 F. Supp. 3d at 628 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285–288 (1998)). Moreover, when a Title VI claim does not involve an official policy of intentional discrimination, a plaintiff must allege an "appropriate person—an official authorized to institute corrective measures—had actual knowledge of the discrimination and responded with deliberate

indifference." *Mohamed*, 252 F. Supp. 3d at 627 (citing *Gebser*, 524 U.S. at 290 (internal quotations omitted)).

Wren alleges that Halberg and Knauff systematically discriminated against her and Student A based on their nationality by using harsh grading practices against them. (ECF No. 25 at 26). Wren attempts to imply discriminatory intent from Halberg and Knauff by highlighting certain statements allegedly made by Knauff and by stating that Halberg and Knauff double-graded only her and Student A, two of the three African-American students in the FNP II course. (*Id.*). Further, Wren alleges Halberg, Knauff, and Walker unequally enforced the syllabus and that Halberg and Knauff subjected them to different conditions during the clinical practicum examination. (*Id.* at 27). Wren also alleges a non-African American student did not pass the FNP II practicum and was not double-graded. (*Id.*).

Without deciding whether the acts of Walker, Halberg, and Knauff create a reasonable inference of unlawful discrimination against Wren, the undersigned concludes that those claims must be dismissed because MSU cannot be held vicariously liable under Title VI. To state a claim against MSU, Wren must either allege sufficient facts to demonstrate the emloyees' acts were due to an official policy of discrimination or that an appropriate person had actual knowledge of the discrimination and acted with deliberate indifference. Wren's allegations concerning MSU's double-grading reveals that she is complaining about how the policy was applied and not that it was an official policy of intentional discrimination.

Wren alleges that Professor Williamson and Johnston were aware of Walker, Halberg, and Knauff's intentional discrimination and were authorized to institute corrective measures, but responded with deliberate indifference. (ECF No. 25 at 20). To support, these allegations, Wren alleges Professor Williamson and Johnston were aware of the "changed grades," and the "passing

second grade," but chose not to intervene in accordance with MSU's handbook for appealing grades. (*Id.* at 28). Wren's conclusory allegations are insufficient to support a Title VI claim against MSU. Assuming Professor Williamson and Johnston are the appropriate persons to institute corrective measures, Wren alleges no facts for the Court to infer when or how they became aware of Walker, Halberg, and Knauff's unlawful conduct against her. Further, without stating how Professor Williamson and Johnston acted with deliberate indifference or how they failed to proceed in accordance with MSU's handbook for appealing grades, Wren has provided no basis for the Court to infer how their actions amounted to deliberate indifference. Thus, Wren's Title VI claim should be dismissed.

## III.    Section 504 of the Rehabilitation Act Claims

Section 504 of the RA prohibits "any program or activity receiving Federal financial assistance" from discriminating against a "qualified individual with a disability." 29 U.S.C. § 794(a). To state a valid RA claim, Wren must allege that she was: (1) an "individual with a disability"; (2) "otherwise qualified" for the program; and (3) excluded from, denied the benefits of, or otherwise subjected to discrimination under the program "solely by reason of her . . . disability." 29 U.S.C. § 794(a).

Wren claims that she is disabled because of her severe allergies under the Title II of the ADA, as expanded by the ADAAA. (ECF No. 25 at 21). Although Wren does not describe her disability, she claims disability status as a disabled veteran for which she receives monthly compensation and medical care from the Veteran's Administration ("VA"). (*Id.*). She claims that MSU discriminated against her because of her disability by refusing to accept documentation of her allergies from the VA indicating a medical exemption to tetanus and flu vaccines, by requiring extensive proof of her severe allergies, and by failing to provide her with any alternatives to being

immunized. (*Id.* at 22). She alleges that MSU instructed her to prove her severe allergic reaction to tetanus and flu vaccinations by providing records from an emergency room visit that had occurred more than ten years previously. (*Id.* at 22). Wren alleges she was never out of compliance for being immunized because state law allowed a medical exemption for reasons of conscience. (*Id.* at 23).

Wren claims she was harassed and discriminated against for not obtaining a tetanus and flu vaccination and was wrongfully dismissed from the FNP for her noncompliance. (*Id.* at 23). However, after obtaining an exemption for reasons of conscience for the Spring 2016 semester, she claims Defendants retaliated against her by causing her to fail the midterm clinical practicum examination. (*Id.* at 24). Further, she claims that Professor Williamson and Johnston were aware of the discrimination and retaliation, but did not intervene. (*Id.*).

### A.    Wren does not allege a qualified disability.

Under both the ADA and RA, any person with a "disability," as defined by the ADA, is an "individual with a disability." 29 U.S.C. § 794; 705(20)(B). The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1).

Although the ADA's definition of "disability" is to be broadly construed in favor of coverage to the "maximum extent permitted by the terms of [the statute]," Wren has not plausibly alleged that she is disabled. 42 U.S.C. § 12102(4)(A). Under subsection A, Wren must allege that she (1) has a mental or physical impairment that (2) substantially limits (3) a major life activity. *Id.* (1)(A). A "major life activity" includes, but is not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking,

breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* (2)(A). Wren alleges that her severe allergies cause her to have a disability because she carries an EpiPen that was prescribed for her. (ECF No. 25 at 22). Further, she alleges that her severe allergies are controlled with medication, diet, and environmental restrictions and that her allergies and treatment affect and limit major life activities. (*Id.*). Even assuming that Wren's allergies result in a physical impairment, she has not alleged how her allergies substantially limit a major life activity. Although she lists major life activities that are impacted by her allergies, Wren does not allege how her allergies substantially limit them. And, while Wren alleges that Defendants refused to accept documentation of her allergies from the VA, this conclusory allegation, taken as true, does not support an inference that her allergies substantially limit a major life activity or that her allergies were regarded as such. Accordingly, her RA claims should be dismissed.

**B.    Wren does not allege that she is "otherwise qualified."**

To be "otherwise qualified," Wren must allege facts that she met the FNP's essential requirements, with or without a reasonable accommodation. *Shaikh v. Texas A&M Univ. Coll. of Med.*, 739 F. App'x 215, 220 (5th Cir. 2018) (per curiam) (citing *McGregor v. La. State Univ.*, 3 F.3d 850, 855 (5th Cir. 1993)). An "essential" requirement is one that, if removed, would alter the fundamental nature of the program. *Id.* Wren's complaint alleges that she was readmitted to the FNP in November 2014 after submitting a compliant affidavit providing an exemption from immunizations for reasons of conscience. (ECF No. 25 at 10). But the day before taking the FNP II clinical practicum exam in the spring of 2016, she was notified via email that her immunization documentation was insufficient and that she would be dismissed from the FNP if her vaccinations were not up to date. (*Id.* at 12). However, Wren concedes that she participated in the FNP II clinical practicum and took the clinical practicum exam, but obtained a failing grade that precluded her

from continuing in the FNP. (*Id.* at 13, 20). Wren's SAC suggests that she was not otherwise qualified to continue in the FNP because she failed the clinical practicum examination, not because of her disability. Accordingly, Wren has not alleged facts to support her claim that she was otherwise qualified to continue in the FNP.

### C.    Wren does not allege that she was discriminated against "solely by reason of her disability."

To recover under the RA, Wren must allege facts to establish that she was discriminated against solely because of her severe allergies. 29 U.S.C. § 794(a). This requires a "causal connection" between her disability and Defendants' allegedly discriminatory conduct, and Wren's disability must be the "only cause" of Defendants' conduct. *Shaikh*, 739 F. App'x at 222 (citing *Sedor v. Frank*, 42 F.3d 741, 746 (2d Cir. 1994)). If Defendants' conduct was "motivated at least in part by a factor other than [Wren's] disability, the [RA] claim must be rejected." *Sedor*, 42 F.3d at 746.

Wren's SAC is not clear as to which of Defendants' conduct—application of MSU's immunization policy or her allegedly coerced withdrawal from the FNP—was caused by Wren's disability. Wren complains that Defendants discriminated against her by requiring proof of her immunization before participating in the FNP and requesting medical verification of her disability. (ECF No. 25 at 22). The state of Texas requires "students entering, attending, enrolling in, and/or transferring to . . . institutions of higher education," like MSU, to be vaccinated. 25 Tex. Admin. Code § 97.61 (West 2018).

A student may seek an exclusion from the vaccination requirement by presenting a "completed, signed and notarized affidavit" stating that the student declines to be vaccinated for reasons of conscience. *Id.* § 97.62(2). Such an affidavit is valid for a two-year period. *Id.* A student may also claim an exclusion for medical reasons that must be supported by an exemption statement

signed by a licensed physician who examined the student. *Id.* § 97.62(1). An exemption statement is only valid for one year unless it states that a lifelong condition exists. *Id.* Wren alleges that she last submitted an exemption with her application to the FNP in 2011. (ECF No. 25 at 21). She complains that Defendants harassed and discriminated against her for not obtaining tetanus and flu vaccinations. (*Id.*). She does not allege the date of the exemption in her September 2011 application or if a proper medical exclusion was on file with MSU that complied with § 97.62(1). Further, After she submitted the proper affidavit, stating she declined to be immunized for reasons of conscience, MSU readmitted her to the program. (*Id.* at 10, 23). It appears that Defendants' alleged "harassment and discrimination" consisted of attempting to verify Wren's exemption from compliance with Texas' immunization requirements. Thus, Wren's alleged disability is not the only cause for Defendants' conduct.

Wren also alleges that Defendants discriminated against her by "threatening her to get the vaccination[s]" or be dismissed from the FNP. (*Id.* at 24). But Wren also alleges that her grades from the clinical practicum did not meet MSU's threshold for continuing in the program, and that Defendants discriminated against her based on her race. (*Id.* at 16, 26–28, 34). Thus, Wren alleges multiple reasons, other than her disability, that could have caused MSU to administratively withdraw her from the FNP. Accordingly, because Wren's disability is not the only cause of Defendants' allegedly discriminatory conduct, her RA claim should be dismissed.

## IV.    Title II of the ADA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To state a valid ADA claim, Wren must allege: (1) she has a qualifying disability;

(2) she is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) such discrimination is due to her disability. *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011) (per curiam). The ADA "applies to public entities regardless of whether they receive federal funds," implicating Congress's power to abrogate state sovereign immunity. *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 276 n.4 (5th Cir. 2005) (en banc). Thus, Congress may abrogate Texas' sovereign immunity if it exercises its power under section 5 of the Fourteenth Amendment. *Shaikh*, 739 F. App'x at 224 (citing *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003)).

To determine whether Congress has abrogated a state's sovereign immunity, the Court applies a three-part inquiry under *United States v. Georgia*, 546 U.S. 151 (2006). Step one is to determine which aspect of Defendants' conduct violated the ADA. *Id.* at 159. Step two is to determine to what extent Defendants' conduct also violated the Fourteenth Amendment. *Id.* At this step, if Defendants' conduct violated both the ADA and a constitutional guarantee, then there is no sovereign immunity, but if the Defendants' conduct violated neither, then the claim must fail. *Duncan v. Univ. of Texas Health Sci. Ctr. at Houston*, 469 F. App'x 364, 367 (5th Cir. 2012) (per curiam). In step three, if Defendants' conduct violated the ADA but not a constitutional guarantee, then the Court will determine "whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.* (citing *Hale*, 642 F.3d at 498).

Wren's ADA claim is premised on the same facts underlying her RA claim. The only material difference, for this case, between the ADA and the RA is the causation requirement. *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). Under the ADA, Wren's disability need not be the sole cause of Defendants' discriminatory conduct for her claim to be viable. *Id.* But as discussed above, Wren has failed to allege that she has a qualified disability.

Although Wren alleges that she was coerced into withdrawing from the FNP because she refused to be immunized, she does not allege how any Defendant used Texas' immunization requirements in a discriminatory manner. Thus, Wren's allegations do not establish an ADA violation.

Nor does this conduct violate the Fourteenth Amendment. The due process clause of the Fourteenth Amendment prohibits any state from "depriv[ing] any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, § 1, and "has been viewed as guaranteeing procedural due process and substantive due process," *John Corp. v. City of Houston*, 214 F.3d 573, 577 (5th Cir. 2000). The Supreme Court and the Fifth Circuit have assumed, without deciding, that students have a constitutionally protectible interest in continued higher education enrollment. *See Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 222–23 (1985) (even if university student's "assumed property interest gave rise to a substantive right under the Due Process Clause to continued enrollment free from arbitrary state action, the facts of record disclose no such action"); *Shaboon v. Duncan*, 252 F.3d 722, 730 (5th Cir. 2001) (assuming, without deciding, that a medical resident had protected due process interest in his position). Accordingly, the undersigned will also assume that Wren had a protected interest in her continued enrollment at MSU.

In an academic setting, due process requirements differ if the student was dismissed for disciplinary reasons or for academic reasons. *Shah v. Univ. of Texas Sw. Med. Sch.,* 54 F. Supp. 3d 681, 692 (N.D. Tex. 2014). If a student is dismissed for disciplinary reasons, then "the student [should] be given [an] oral or written notice of the charges against [her] and, if [she] denies them, an explanation of the evidence the authorities have and an opportunity to present [her] side of the story." *Goss v. Lopez,* 419 U.S. 565, 581 (1975). In contrast, due process does not require a hearing before dismissing a student for failure of academic performance or a right of appeal before

dismissing a student for poor performance. *Shah*, 54 F. Supp. 3d at 692 (citing *Horowitz*, 435 U.S. at 90 (hearing) and *Yoder v. Univ. of Louisville*, 526 F. App'x 537, 551 (6th Cir. 2013) (appeal)).

Wren's SAC does not allege facts supporting a lack of due process concerning her severe allergies. Throughout the SAC, Wren claims she was deprived due process because Defendants did not notify her in advance that she was not compliant with MSU's immunization policy. (ECF No. 25 at 24). But Wren fails to allege any facts stating that Defendants should have followed some other process before notifying her that her immunization records were out of compliance. Further, her own allegations suggest that Defendants took reasonable steps to confirm the severity of her allergies to comply with Texas' immunization statute. This is supported by Wren's statement that once she submitted the proper affidavit declining to be vaccinated for reasons of conscience, she was allowed to reenroll in the FNP program. Thus, Wren has failed to allege a due process violation.

Because Wren failed to allege that Defendants' conduct violated the ADA and the Due Process clause, there is no abrogation of sovereign immunity, and her ADA claim should be dismissed for lack of subject matter jurisdiction.

## V.    Retaliation under Title II of the ADA and Section 504 of the Rehabilitation Act

Wren asserts in conclusory fashion that Defendants retaliated against her for obtaining an exemption from immunization, enabling her to participate in the FNP without being immunized. (ECF No. 25 at 23–24). Wren's retaliation claim is not asserted in a separate section of her SAC, but is interspersed with her ADA and RA claims. Because the Fifth Circuit jointly interprets the ADA and RA together, the Court will analyze Wren's retaliation claims under the ADA and RA together. *See Cohen v. Univ. of Texas Health Sci. Ctr.*, 557 F. App'x 273, 277 (5th Cir. 2014); *see*

*also Shannon v. Henderson*, 275 F.3d 42 & n.6 (5th Cir. 2001) (per curiam) (analyzing an RA retaliation claim under the same burden-shifting rubric as that of the ADA and Title VII).

The elements of a retaliation claim under the ADA and RA are: (1) engagement in a protected activity; (2) an adverse action; and (3) a causal connection between the protected act and the adverse action. *See Calderon v. Potter*, 113 F. App'x 586, 592 (5th Cir. 2004) (per curiam). Wren alleges she was given a failing grade in the spring of 2016, presumably by Knauff and Halberg, in retaliation for receiving an exemption from immunizations in the fall of 2014. (ECF No. 25 at 25). But Wren has not alleged she was retaliated against due to any protected activity. She admits taking the clinical practicum exam in Halberg's clinic. Thus, she was not denied a benefit or excluded from the clinical practicum examination because of her alleged severe allergies. Further, she has failed to allege a causal connection between being granted the exemption from immunization and receiving a failing grade in the clinical practicum, which is supported by Wren's statement that she earned a 90 on her first clinical assignment with Halberg before she took the clinical practicum. (*Id.* at 12). Moreover, the passage of time between obtaining the exemption in November 2014 and failing the clinical practicum in the spring 2016 does not support a causal connection.

In another section of her SAC, Wren alleges Knauff was hostile to her in an email regarding the time of her clinical practicum examination and compliance with vaccinations and drug screening. (*Id.* at 20). Wren also alleges her immunization compliance was discussed during her clinical practicum exam. (*Id.*). However, she does not allege how this communication resulted in her failing grade. Thus, taken as true, these allegations are insufficient to state a claim for retaliation under the RA and ADA.

## VI.    Constitutional Claims

Wren alleges her due process and equal protection rights were violated when she was coerced into withdrawing from the FNP because of her noncompliance with MSU's immunization policy and failed clinical practicum examination.

### A.    Professor Williamson and Johnston

Defendants argue that all of Wren's constitutional claims asserted through section 1983 should be dismissed as to Professor Williamson and Johnston. (ECF No. 37 at 53).

To state a claim against the individual Defendants under section 1983, a plaintiff must show "they were either personally involved in the constitutional violations alleged or that their wrongful actions were causally connected to the constitutional deprivation." *Salcido v. Univ. of S. Miss.*, 557 F. App'x 289, 292 (5th Cir. 2014) (per curiam) (citing *Jones v. Lowndes Cnty., Miss.*, 678 F.3d 344, 349 (5th Cir. 2012)). A plaintiff must allege specific conduct giving rise to the constitutional violation; conclusory assertions are not enough. *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002). Further, "[a] supervisor is not personally liable for his subordinate's actions in which he had no involvement." *James v. Texas Collin Cty.*, 535 F.3d 365, 373 (5th Cir. 2008).

Wren asserts claims against Professor Williamson and Johnston in their supervisory capacities, but does not allege any personal involvement by them. (*See* ECF No. 25 at 2, 24, 26, 28, 38). Further, her allegations are conclusory. (*See, e.g.*, *id.* at 38 ("[Professor Williamson] and [Johnston] was [sic] aware of the discrimination, were officials authorized to instituter [sic] corrective measures[,] and responded with deliberate indifference."). In the absence of any statement of facts to support those conclusions, Wren has failed to allege any constitutional claim against Professor Williamson and Johnston. Those claims should be dismissed.

B.    **Due Process**

Wren's SAC repeatedly states that Defendants violated her due process rights. (*See* ECF No. 25 at 6, 17, 24, 25, 26, 28, 32, 34, 36). Wren's due process violations, succinctly stated, are as follows: She could not appeal her clinical practicum grade in the same way she could a course grade, and she was not provided with advance notice that she was not compliant with MSU's immunization policy. As stated above, Wren has not stated a due process claim for the lack of advance notice that she was not compliant with MSU's immunization policy.

Wren also has failed to state a claim that her due process rights were violated when she could not appeal her clinical practicum grade. Wren's allegations suggest that she was unable to appeal her failing clinical practicum grade because it was not a course grade and that she was coerced into withdrawing from the FNP II course. (ECF No. 25 at 17, 32).

1.    **Procedural Due Process**

When a student challenges an adverse academic, due process requires "far less stringent procedural requirements." *Horowitz*, 435 U.S. at 86. This is because educational institutions "should not be weighted down with formalized procedural requirements imposed by actors estranged from the academic environment." *Davis v. Mann*, 882 F.2d 967, 974 (5th Cir. 1989). Adverse academic actions against a nursing student only require "minimum procedures of notice and not a hearing." *See Ekmark v. Matthews*, 524 F. App'x 62, 64 (5th Cir. 2013) (citing *Horowitz*, 435 U.S. at 90); *Shah*, 54 F. Supp. 3d at 692 (due process does not require a student a right to appeal dismissal based on poor academic performance (citing *Yoder*, 526 F. App'x at 551)). Thus, the due process owed to Wren was that MSU "fully [inform her] of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment." *Horowitz*, 435 U.S. at 85.

Wren's allegations, taken as true, show MSU afforded her all process that was due. First, Wren knew that a failing grade on the clinical practicum exam would preclude her from continuing in the FNP thereby delaying graduation as she would have to retake the FNP II course to complete the FNP degree program. (ECF No. 25 at 34). Second, she was fully informed of the faculty's dissatisfaction on the clinical practicum examination. Wren states that after taking the clinical practicum exam, either Halberg or Knauff discussed the results with her and communicated she had failed the exam. (*Id.* at 15). She was instructed to withdraw from the FNP II course. (*Id.*). However, before withdrawing, she was given another chance to take the clinical practicum exam with another professor. (*Id.* at 16). Although she obtained an 83 on the exam, when averaged with her prior exam results, the grade did not, nor could it have, meet the 80-percent threshold for passing the course. (*Id.*). Wren requested a meeting with the department chair, but was referred back to Knauff. (*Id.* at 17). She had a discussion with Knauff where she told Wren that she could not continue in the FNP without completing the FNP II course. (*Id.*). Eventually, Wren discussed with the dean of the school about her clinical practicum grade. She claims the dean told her that if she did not withdraw from the FNP II course, an "F" would be entered and that an appeal would not change the outcome. (*Id.*). Wren withdrew from the course to preserve her good standing with hopes of possibly transferring to another school (*Id.*). She also enrolled in the summer 2016 special topics course and earned an "A" in that course. (*Id.* at 17–18). She requested an investigation of the events concerning the administration of the clinical practicum exam in April 2016 and was presented with the results in October 2016. (*Id.* at 17–18).

Wren claims she could not appeal the clinical practicum exam grade, a claim that MSU disputes. However, MSU was not required to provide her with an appeal. Instead, the dean of the school and Knauff communicated with her about the clinical practicum examination results. First,

Knuaff or Halberg presented the results the same day she took the clinical practicum. Second, Wren was redirected by the department chair to Knauff, who refused Wren's request to continue in the FNP II course. Third, Wren discussed the issue with the dean of the school, who told her she should withdraw from the course or receive an "F." Although Wren alleges she was unable to appeal her grade, she apparently discussed the matter with her instructor and dean of the school. Under the facts alleged by Wren, taken as true and in the light most favorable to her, Wren was informed of Halberg and Knauff's dissatisfaction with her performance on the clinical practicum exam, and she knew a failing grade would prolong her enrollment in the FNP program. Instead of retaking the FNP II course, she decided to withdraw from the FNP. Accordingly, Wren has failed to properly plead that her procedural due process rights were violated.

### 2.    Substantive Due Process

"When judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment." *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225 (1985). Courts that have addressed the issue, almost universally, uphold "the academic decisions of public universities when challenged on substantive due process grounds." *Shah*, 54 F. Supp. 3d at 696 (citing cases). "The reach of substantive due process is limited, however, and it protects against only the most serious of governmental wrongs." *Moore v. Dall. Indep. Sch. Dist.*, 557 F. Supp. 2d 755, 761 (N.D. Tex. 2008) (citation omitted). Courts may not override an adverse academic decision "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Ewing*, 474 U.S. at 225.

Here, Wren's allegations do not show that the individual Defendants' actions were a substantial departure from academic norms. Wren was double-graded during the clinical practicum

examination, and Wren admits that the course syllabus stated this practice would be followed. (ECF No. 25 at 14). Knauff and Halberg reviewed her clinical journal and then proceeded with the clinical practicum examination. (*Id.*). Wren was permitted to use only one text during the examination. (*Id.* at 15). And she received a failing grade from both Knauff and Halberg. Although, later, she was permitted to retake the exam proctored by a different professor using any course resource, the facts alleged by Wren do not show how her being double-graded or limited to a single source during the exam was such a substantial departure from academic norms that Knauff and Halberg did not exercise professional judgment. Accordingly, Wren's substantive due process claim should be dismissed.

### C.    Equal Protection

Wren also alleges an equal protection claim. Wren claims that she was not (1) afforded a reasonable alternative from obtaining flu and tetanus vaccinations; (2) allowed to use an alternative resource during her clinical practicum examination; and (3)  provided an opportunity to participate in an orientation at Halberg's clinic prior to her examination.

"To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." *Williams v. Bramer*, 180 F.3d 699, 705 (5th Cir. 1999) (quoting *Johnson v. Morel*, 876 F.2d 477, 479 (5th Cir. 1989)) (internal quotation marks omitted). A plaintiff may assert "an equal protection claim based on a 'class of one.'" *Bryan v. City of Dallas*, 188 F. Supp. 3d 611, 619 (N.D. Tex. 2016) (quoting *Stotter*, 508 F.3d at 823–24). "To do so, she must show that '(1) she was treated differently from others similarly situated and (2) there was no rational basis for the disparate treatment.'" *Id.*

Wren's allegation that she was not afforded a reasonable alternative from flu and tetanus immunizations fails to state an equal protection violation. Nowhere in the SAC does Wren allege facts showing Defendants discriminated against her based upon her class membership by misapplying MSU's immunization policy. Even if she could claim she was treated differently, she has alleged no facts to suggest Defendants lacked a rational basis for enforcing the immunization policy as mandated by the state of Texas. Accordingly, Wren's allegation on this issue fails to state a claim.

As for her claim she was not allowed to use alternative resources during her clinical practicum examination, Wren has not pleaded any facts to show that this unequal treatment was due to her membership in a protected class. Nor does she allege how these "other students" were outside her protected class. This is particularly vexing because Wren alleges another African-American student, Student A, took the clinical practicum exam on the same day at Halberg's clinic and was double-graded, but she does not allege this student was limited to a single resource. Thus, the action of which she complains does not appear to distinguish between two or more relevant persons or groups who are not of the same class. Accordingly, Wren's equal protection claim should be dismissed on this issue.

Wren's allegation that she was not provided an opportunity for orientation at Halberg's clinic prior to the clinical practicum examination is also without merit. She alleges that a Caucasian student, Student C, attended a hospital orientation allowing her to accrue clinical hours at Halberg's clinic. (ECF No. 25 at 18). Although Student C was not in Wren's clinical group, Halberg was Student C's clinical instructor for FNP II. (*Id.*). Further, Student C resided in Wichita Falls, Texas. (*Id.*). Wren alleges she was only required "to come to Wichita Falls for the clinical practicum [examination] . . . ." (*Id.*). However, Wren does not allege that Halberg was her clinical

instructor for the FNP II course or that Student C was taking the clinical practicum examination with her. (*See id.* at 18–19, 32–33). Thus, she has not alleged any facts that student C was similarly situated with her. Moreover, there are no facts to indicate Wren was not afforded an opportunity to take the orientation because of any intentional discrimination or which of the individual Defendants supposedly were responsible for providing her with that opportunity. Accordingly, Wren has failed to state an equal protection claim on this basis.

### D.    First Amendment Retaliation

To state a First Amendment retaliation claim, Wren must show that (1) she was "engaged in constitutionally protected activity," (2) the Defendants' "actions caused [her] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity," and (3) the Defendants' "adverse actions were substantially motivated against [her] exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). Wren's allegations under this section state that she "raised matters of public concern, pertaining to systematic discrimination and retaliation" and that Defendants retaliated against her by threatening her with "refusal of vaccinations and the financial aid department applying her Hazelwood Acts funds without permission." (ECF No. 25 at 36).

Wren has failed to allege a First Amendment retaliation claim. First, she has not alleged any exercise of a constitutionally protected right, as her immunization and financial issues are concerns of an individual student and not matters of public concern. Second, Wren was successful in obtaining an exemption from immunization, and MSU refunded her Hazelwood Act funds and forgave the associated debt. (ECF No. 25 at 10–11). Thus, Defendants' actions can hardly be considered to chill Wren's alleged First Amendment rights. Moreover, she has not alleged any

facts to show any individual Defendants' conduct was motived against the exercise of her First Amendment rights. Accordingly, Wren's First Amendment retaliation claim should be dismissed.

## VII.    Qualified Immunity

The individual Defendants have asserted a qualified immunity defense to Wren's claims. They contend she has not pleaded sufficient facts to show that any particular action taken by them violated clearly established law. (ECF No. 37 at 53).

The doctrine of qualified immunity protects government officials from suit and liability for civil damages if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Once an official asserts qualified immunity, the burden shifts to the plaintiff to rebut the defense. *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017).

"The issue of qualified immunity is often resolved on summary judgment, but the Court may also consider the issue in a motion to dismiss." *Gill v. Delvin*, 867 F. Supp. 2d 849, 855 (N.D. Tex. 2012) (citing *Iqbal*, 556 U.S. at 677–78); *see also Brown v. City of Houston*, 297 F. Supp. 3d 748, 772–73 (S.D. Tex. 2017) (analyzing cases to determine that the issue of qualified immunity may be considered on a motion to dismiss). However, the Supreme Court has held that a plaintiff is not required to anticipate a qualified immunity defense by providing greater specificity in his initial pleading. *Crawford-El v. Britton*, 523 U.S. 574, 595 (1998); *Schultea v. Wood*, 47 F.3d 1427, 1430 (5th Cir. 1995) (en banc) ("[W]e will no longer insist that a plaintiff fully anticipate the defense in his complaint at the risk of dismissal under Rule 12."). Here, Defendants' first

motion to dismiss contained their qualified immunity defense. As is such, Wren was on notice of the defense before filing her SAC.

When determining whether an official can claim qualified immunity, courts engage in a two-step analysis. *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016). "First, they assess whether a statutory or constitutional right would have been violated on the facts alleged." *Id*. "Second, they determine whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* The Fifth Circuit requires that the law "so clearly and unambiguously prohibited the violative conduct that '*every* reasonable official would understand that what he is doing violates the law.'" *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (emphasis in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The Supreme Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Al-Kidd*, 563 U.S. at 741.

As analyzed above, Wren has not pleaded sufficient facts to demonstrate that the individual Defendants' actions violated any of her statutory or constitutionally protected rights, much less in a manner that was so clearly and unambiguously proscribed by existing precedent. Although Wren cites to case law summarizing the qualified immunity defense, she does not point to any case that would put the statutory or constitutional question at issue in her case beyond debate. Accordingly, the individual Defendants should be entitled to qualified immunity with respect to Wren's constitutional claims asserted through section 1983.

## VIII.   Statute of Limitations

The Court also notes that Wren's claims under Title VI, section 1983, the ADA, and the RA appear to be time barred. The forum state's general personal injury limitations period applies to such claims, which in Texas is two years. *Helton v. Clements*, 832 F.2d 332, 334 (5th Cir. 1987)

(§§ 1981, 1983, 1985, and 1988); *Griffin v. Round Rock Indep. Sch. Dist.*, 82 F.3d 414, 1996 WL 166999, at *1 (5th Cir. 1996) (per curiam) (unpublished) (Title VI); *Frame v. City of Arlington*, 657 F.3d 215, 237 (5th Cir. 2011) (ADA and the RA); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a) (West 2017). However, federal law governs when a discrimination claim accrues, which is when "the plaintiff knows or has reason to know of the injury that is the basis of [her] complaint." *Helton*, 832 F.2d at 334–35.

Wren filed her original complaint on April 30, 2018. (ECF No. 1). Her SAC states that she withdrew from the FNP and requested an investigation into her discrimination and retaliation claims in April 2016. (ECF No. 25 at 19). It is unclear when in April 2016 Wren was on notice that she should withdraw or be administratively dismissed from the FNP. In her response to Defendants' Motion, Wren provides a more detailed timeline of events. She states she "alluded" to a discrimination complaint at the Dean of Student Affairs office on March 29, 2016, and that she formally requested an investigation on April 5, 2016. (ECF No. 46 at 9). Also on April 5, 2016, she was instructed by MSU personnel to withdraw or be administratively dropped from the FNP program. (*Id.*). According to Wren, she was coerced into withdrawing from the FNP on April 6, 2016. (*Id.*). From this timeline, it is clear that Defendants' alleged discriminatory conduct that resulted in her "coerced" withdrawal occurred more than two years before she filed her original complaint. Wren's ADA and RA claims also are time-barred because Defendants' discriminatory conduct based upon her disability occurred before she was allegedly dismissed from the FNP I course in October 2014. (ECF No. 25 at 10). Further, any discriminatory conduct based on her disability leading up to the clinical practicum midterm examination took place more than two years before she filed her original complaint as discussed above. Consequently, these claims are time barred and should be dismissed.

Wren's attempt to invoke equitable tolling consideration also is unavailing. For equitable tolling to be appropriate, external forces, rather than a litigant's lack of diligence, must account for the failure of a complainant to file a timely claim. *Glus v. Brooklyn Eastern Dist. Terminal*, 359 U.S. 231, 235 (1959) (finding a limitation period equitably tolled where the adversary misled the complainant about the deadline for filing an action). "Equitable tolling applies principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights." *Coleman v. Johnson*, 184 F.3d 398, 402 (5th Cir. 1999) (quoting *Rashidi v. American President Lines*, 96 F.3d 124, 128 (5th Cir. 1996)). Such tolling is an extraordinary remedy that courts should extend sparingly and not to what may be, at best, a garden variety claim of "excusable neglect." *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990); *Coleman*, 184 F.3d at 402. "[W]hen state statutes of limitation are borrowed, state tolling principles are to be the 'primary guide' of the federal court. The federal court may disregard the state tolling rule only if it is inconsistent with federal policy." *FDIC v. Dawson*, 4 F.3d 1303, 1309 (5th Cir. 1993) (citations omitted). Wren states that she did not receive MSU's investigation report concerning her claims until October 19, 2016 or the clinical practicum exam grade sheets until November 29, 2016. (ECF No. 46 at 9). But Wren does not explain how not knowing the information contained in the report or grade sheet misled or prevented her from timely filing her suit. This is especially true because she formally requested an investigation of her claims on April 5, 2016. Thus, Wren has not shown that she has diligently pursued her claims such that equitable tolling is warranted.

## IX.    Supplemental Jurisdiction

Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a claim if the court has dismissed all claims over which it has original jurisdiction. Following dismissal of Wren's federal claims, the Court does not have original jurisdiction over her breach of fiduciary duty, intentional infliction of emotional distress, and fraud claims because Wren and Defendants are citizens of Texas. (*See* ECF No. 25).

The Fifth Circuit has instructed district courts to consider the common law factors of "judicial economy, convenience, fairness, and comity," which are to be considered on a case-by-case basis. *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008). Here, Wren's state law claims clearly do not predominate over the claims over which the Court has original jurisdiction. And, given the procedural posture of the case, judicial economy does not warrant the Court to retain supplemental jurisdiction. Wren should be allowed to refile her state-law claims in Texas state court.

## VII.    Wren's claims should be dismissed with prejudice.

Although the Court should dismiss a complaint without prejudice in most cases, a plaintiff must have some "viable avenue to recover" according to which the plaintiff could amend the complaint. *See Parker v. Allstate Ins. Co*., 3:16-CV-00892-CWR-FKB, 2017 WL 4287912, at *1 (S.D. Miss. Sept. 27, 2017). When a plaintiff has alleged her best case, then dismissal with prejudice is appropriate. *Jones*, 188 F.3d at 326–27.

As alleged in her SAC, Wren's ADA claim, Texas state-law claims, claim under section 97.62 of Title 25 of the Texas Administrative Code, and constitutional claims under section 1983 against MSU and the individual Defendants in their official capacities are barred by Eleventh Amendment immunity. The Fifth Circuit has "repeatedly referred to the Eleventh Amendment's

restriction in terms of subject matter jurisdiction." *United States v. Texas Tech Univ.*, 171 F.3d 279, 286 n.9 (5th Cir. 1999) (citing *Warnock v. Pecos County, Texas*, 88 F.3d 341, 343 (5th Cir. 1996)). Thus, any of Wren's claims that are barred by Eleventh Amendment immunity should be dismissed without prejudice because the Court lacks subject matter jurisdiction. *Anderson v. Jackson State Univ.*, 675 F. App'x 461, 464 (5th Cir. 2017) (per curiam) (citing *Warnock*, 88 F.3d at 343).

This is the second time the undersigned has recommended Wren's complaint be dismissed. Wren filed a lengthy, detailed complaint, and has amended her complaint two times to add new defendants and assert more detailed allegations. Considering the various avenues for dismissing Wren's claims, the undersigned concludes that Wren has stated her best case. Thus, her claims asserted against the Defendants individually should be dismissed with prejudice.

## CONCLUSION

After considering the pleadings and applicable law, the undersigned **RECOMMENDS** that Judge O'Connor **GRANT** Defendants' Second Motion to Dismiss (ECF No. 32); **DISMISS WITHOUT PREJUDICE** Plaintiff's claims against MSU and the individual Defendants in their official capacities for lack of subject matter jurisdiction; **DISMISS WITH PREJUDICE** Plaintiff's claims against the Defendants in their individual capacities for failure to state a claim; and **DECLINE** to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims.

A copy of this Findings, Conclusions, and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Findings, Conclusions, and Recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b)(1). In order to be specific, an objection must identify the specific finding or recommendation to which the objection is made,

state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).

Signed June 25, 2019.

Hal R. Ray, Jr.
UNITED STATES MAGISTRATE JUDGE